IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBIN R. WILSON-SAULS,

               Plaintiff,

       v.

MICHELLE D. CURTIS; WARREN C.
GIVENS; LEROY B. HAINS; RONALD R.
HAERTLING; LTC DAVID E. HOLLIDAY;
BONNIE ANN LAZOR; DANIEL McBRIDE;
SALLY McBRIDE; ROBERT E. STEELE;
DANIEL L. TRETTEN; and UNITED
STATES of AMERICA,

               Defendants.

Civil No. 07-0163-AS

FINDINGS AND RECOMMENDATION

ASHMANSKAS, Magistrate Judge:

**PROCEDURAL HISTORY**

Robin Wilson-Sauls filed a Complaint alleging federal and

state claims against 10 named individuals, including Daniel and

Sally McBride (McBrides), and the United Sates of America, arising

from injuries she sustained on February 11, 2005, while working as a security guard at the Umatilla Army Depot (Depot), and events that occurred over the following months. With the exception of Sally McBride who was sued only in her individual capacity, all individuals were sued in both their official and individual capacities.

With respect to the McBrides, Wilson-Sauls claims they are liable, either directly or in concert with the other defendants for violating her civil rights and in tort. In regard to the alleged violations of her civil rights, Wilson-Sauls seeks relief pursuant to: (1) 42 U.S.C. § 1983; (2) 42 U.S.C. § 1985; and (3) <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388 (1971). In regard to her tort claims, she seeks relief under the Federal Tort Claims Act, 28 U.S.C. § 2674, and Oregon common law.

The McBrides filed a Motion for Summary Judgment against all of Wilson-Sauls' claims. Subsequent to oral argument, but before ruling on the McBrides summary judgment motion, Wilson-Sauls filed a Motion to File Amended Complaint and to Correct Caption. The McBrides opposed Wilson-Sauls's request to amend the complaint and the court deferred ruling on that motion until the Findings and Recommendation (F&R) was issued on the McBrides' pending summary judgment motion. After a careful review of the record and for reasons of judicial efficiency the court consolidated its decisions on both pending motions. For the reasons that follow, Wilson-

Sauls' Motion to File Amended Complaint and to Correct Caption is granted; and the McBrides' Motion for Summary Judgment should be granted, in part, and denied, in part.

## STATEMENT OF FACTS

The following recitation of facts is based on the parties' Concise Statement of Material Facts and the supporting affidavits and exhibits.

The Depot stores mostly dangerous chemicals and some ammunition. Daniel McBride has been employed as a security guard at the Depot since approximately September 2004. His duties are to patrol the army base, including the fences and gates. Wilson-Sauls was hired as a security guard at the Depot approximately one month after McBride. Michael Holloman was also a security guard at the Depot. Sally McBride is not an employee of the Depot.

Daniel McBride had no supervisory authority over Holloman or Wilson-Sauls and they did not have any supervisory authority over him. In fact, McBride had no authority to hire, terminate, schedule or assign duties to any employee at the Depot.

Daniel McBride insists that he had no personal knowledge of Holloman's mental condition. Daniel McBride represents that he never heard or witnessed any behavior by Holloman that would lead him to believe that Holloman suffered mental defects. McBride also warrants that he had no personal knowledge regarding whether Holloman had disciplinary issues at work, a propensity for violence

or whether the Depot command had suspended Holloman's security clearance and relieved him of his weapon.

Further, Daniel McBride states that, prior to February 11, 2005, he was unaware that Wilson-Sauls experienced a prior incident with Holloman and a vehicle. In fact, Daniel McBride contends that he learned about Wilson-Sauls' allegation that Holloman had assaulted her with a vehicle from the Complaint filed in this case.

Daniel McBride did not witness the accident that occurred between Holloman and Wilson-Sauls on February 11, 2005. Daniel McBride was at work on patrol, approximately two and a half miles away from the accident scene. He overheard a radio call from Holloman to the base reporting an accident and providing the location. Daniel McBride immediately responded to the location of the accident and saw Wilson-Sauls lying on her back behind a work truck.

Wilson-Sauls was conscious, with a contusion above her right eye, and appeared to be in pain. She did not explain what had happened, but did complain that her chest hurt. While they waited for the base ambulance to arrive, Wilson-Sauls asked Daniel McBride if he would take her vehicle home and care for her cat while she was away at the hospital. Wilson-Sauls, a trained paramedic, alleges that she thought her injuries were fatal and when Daniel McBride arrived on the scene she handed him keys to her home and car and stated: "I'm dying . . . feed my cat." He agreed and

Wilson-Sauls handed Daniel McBride the keys to her house and automobile.  Within minutes, the base ambulance arrived and the medics took over.

After Wilson-Sauls was transported by ambulance, Daniel McBride assisted security personnel to secure the area and place yellow tape around the scene of the accident.  The parties agree that Daniel McBride handled her weapon during this time.  Wilson-Sauls' alleges, without explanation, that fingerprints from the weapon would have been important to the investigation of the accident.

Wilson-Sauls was taken by life-flight and hospitalized at Emanuel Hospital in intensive care following her accident.  The McBrides visited her during her hospital stay.  The parties dispute whether during this time Daniel McBride warned Wilson-Sauls she could lose her house because of her injuries and reliance on workers' compensation; and whether Daniel McBride repeated this warning later and offered to protect plaintiff.  Wilson-Sauls alleges she was fearful of losing her home.

Daniel McBride alleges that the night of the accident he drove to Wilson-Sauls' home to confirm her cat had food and water.  In fact, for the next week to 10 days, the McBrides went to Wilson-Sauls' home on a daily basis to provide food and water for the cat.  The day following the accident, Daniel McBride had Wilson-Sauls' vehicle delivered to her home.

Daniel McBride spoke to Wilson-Sauls by phone while she was in the hospital and agreed to pick her up and bring her home. She suggested that he use her vehicle for the trip. Wilson-Sauls alleges that, in fact, the Depot arranged for the McBrides to transport her from the hospital to home and to care for her following her release from the hospital. Wilson-Sauls further claims that Daniel McBride was paid by the Depot to transport her. Subsequently, Daniel McBride drove to Portland, picked up Wilson-Sauls from the hospital and drove her to his house in Pendleton where she spent the night. The following day, the McBrides took Wilson-Sauls to her house. Over the next several weeks, as Wilson-Sauls continued to recover from her injuries, the McBrides assisted her with cooking, cleaning, laundry, doctors' appointments and errands.

Wilson-Sauls alleges that before she left the hospital, the McBrides had packed her belongings into boxes and a dresser and began moving their belongings into her home. After her return home, the McBrides continued living in her home, using her money, food and shelter, physically and emotionally intimidating her and eventually ordering her to "get out" of her home and forced her to move into a tent on her property. Moreover, Wilson-Sauls maintains that she was afraid of the McBrides because of their violent tendencies and Daniel McBride's temper and threats. Physically, Wilson-Sauls is small, 5'3", 94 lbs., and Daniel McBride is big,

6'2", 250 lbs. Wilson-Sauls contends the McBrides knew she was vulnerable and took advantage of her to move into her home and to force her to lease the home to them. She was unable to protect herself because of the brain injury she suffered in the accident. Other than the description of physical size, the McBrides flatly deny these claims.

A week or two prior to the accident, the McBrides delivered an extra barbeque belonging to them to Wilson-Sauls at her home. After the McBrides showed her how to operate the grill, the threesome had a "cook-out". During the cook-out, Wilson-Sauls showed the McBrides around her house. Wilson-Sauls owned approximately four acres with a two-bedroom house located on one section. Wilson-Sauls informed the McBrides that she wanted to bulldoze her house and build an A-frame style home on an area of her property overlooking the river. At that time, the McBrides inquired whether Wilson-Sauls would consider selling them the existing house and two acres. The parties dispute whether Wilson-Sauls agreed to sell an interest in her property to the McBrides in 2005.

According to Wilson-Sauls she was aware that, because of her Veterans Administration (VA) loan she could not sell for at least one year. Rather, she explains, she signed the lease agreement to get the McBrides "off her back". Wilson-Sauls asserts that she intentionally inserted an expiration date of April 29, 2005, in the

lease agreement so the option would expire the same day.  The McBrides did not exercise the option before it expired.  The McBrides do not dispute that they failed to exercise the option prior to its expiration.  Finally, Wilson-Sauls alleges that when the McBrides drove her to the bank to sign the lease agreement she tried to get the attention of the bank clerk notary to alert the clerk she did not want to sign.  She was afraid the McBrides would get angry if they caught her.  Except for the expiration of the lease agreement, the McBrides deny these allegations.

The McBrides allege that on April 28, 2005, they signed a lease/option agreement (Exhibit 101) with Wilson Sauls.  The McBrides agreed to rent Wilson-Sauls house and two acres of her four acre property for $600 a month for a two-year term.  The agreement was notarized and recorded the following day.  Upon moving out, Wilson-Sauls stated to Daniel McBride that she needed to find temporary accommodation.  Daniel McBride offered to allow Wilson-Sauls to live in his fifth wheel trailer rent free until she determined what her permanent housing situation would be.  According to the McBrides, Wilson-Sauls agreed to the arrangement and Daniel McBride moved the trailer onto the property.  The McBrides rented their home in Pendleton using a similar lease/option agreement and moved into Wilson-Sauls' home.

Wilson-Sauls denies ever signing Exhibit 101.  Rather, she insists that the document she signed was Exhibit A.  According to

Wilson-Sauls, the documents are materially different because Exhibit A includes the expiration date for the alleged option, 24 hours after it was offered. Further, Wilson-Sauls explains that she signed Exhibit A only because she was threatened and coerced by the McBrides at a time when she was vulnerable and unable to protect herself.

Wilson-Sauls initiated a Forcible Entry and Wrongful Detainer action (FED) against the McBrides, which resulted in a stipulated order on May 17, 2005, allowing the McBrides to retain possession. Subsequently, the McBrides and Wilson-Sauls retained, and began communicating through, counsel. Wilson-Sauls filed a second FED action against the McBrides on August 12, 2005. The parties entered into a Settlement and Release Agreement on August 31, 2005, under which the McBrides gave up possession of the property in exchange for certain consideration.

The terms of the Settlement and Release Agreement were negotiated by Wilson-Sauls and the McBrides through their respective attorneys, Jeffrey Caps and Steven Thomas. All parties were represented by legal counsel throughout the settlement negotiations.

Wilson-Sauls claims she was afraid of the McBrides because she had witnessed their violent tendencies. In fact, Daniel McBride allegedly threatened to "beat the s--- out of" her. She explains

that because she did not know she may have federal or state law claims, she did not knowingly or voluntarily give up those claims.

Wilson-Sauls claims the McBrides both frightened her and threatened her and she filed eviction proceedings to remove them from her home. Her eviction notice recited that the McBrides should be ordered out for "3X verbal aggression," "threats," "non-payment and aggressive behavior." The stipulated order entered in the case stated there would be "No Raised Voices."

Although Wilson-Sauls concedes she signed the Settlement and Release Agreement, she asserts that she did so under duress, she was afraid of the McBrides, and believing it was the only way to get back her home. Purportedly, they had forced her out of her home; she was living in a tent; showering with a garden hose; cooking over a wood fire in a hole in the ground. Wilson-Sauls claims she finally left town and was living with friends in Prineville because she was afraid of the McBrides; was in constant pain from her accident; and experienced difficulty sleeping in the tent.

Wilson-Sauls claims that her brain injury prevented her from understanding what was happening to her; she was isolated, afraid and recuperating from serious injuries; and intimidated into signing both Exhibit A and the Settlement and Release Agreement.

Wilson-Sauls contends that she asked for help from both Bonnie Lazor and the Depot. She alleges that Lazor promised to come to her home, but never did. Allegedly, when Daniel McBride discovered Wilson-Sauls had contacted Lazor, he became extremely angry, red in the face, threw a book across the room and threatened Wilson-Sauls.

## DISCUSSION

### I.  Motion to Amend the Complaint

Wilson-Sauls moves for an order permitting the filing of a First Amended Complaint, deleting certain claims and certain defendants, amending certain allegations and correcting the spelling of an individual defendant's name. The McBrides oppose the motion.

#### A.  Legal Standard

"A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served. . . ." Fed. R. Civ. P. 15(a). After the initial pleading stage, a party may amend its "pleading only by leave of court or by written consent of the adverse party; and leave shall be given freely when justice so requires." Fed. R. Civ. P. 15(a). The decision whether to grant or deny leave to amend is within the discretion of the District Court. California v. Neville Chemical Co., 358 F.3d 661, 673 (9th Cir. 2003). Leave to amend, however, "is not to be granted automatically." Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th

Cir. 1990).  Nevertheless, the rule is "to be applied with extreme liberality."  <u>Morongo Band of Mission Indians v. Rose</u>, 893 F.2d 1074, 1079 (9th Cir. 1990).  Absent bad faith, undue delay, prejudice to the opposing party, or futility, a motion for leave to amend should be granted.  <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 186 (9th Cir. 1987).  Factors considered in determining whether to grant a motion to amend include bad faith, undue delay, prejudice to the opposing party, futility of the amendment and whether the party has previously amended his pleadings.  <u>Bonin v. Calderon</u> 59 F.3d 815, 845 (9th Cir. 1995).

**B.  Discussion**

As stated above, Wilson-Sauls seeks leave to file a First Amended Complaint (FAC) to delete certain claims and certain defendants, amend certain allegations and correct the spelling of an individual defendant's name.  Wilson-Sauls further explains that "[t]he amended pleading deletes the conspiracy claim against Daniel McBride and clarifies the other allegations against him.  The amendment is intended to focus the issues in this case and to clarify the allegations against the respective defendants."  Memorandum in Support of Motion to File Amended Complaint at 2.  The McBrides oppose the proposed amendments as unduly prejudicial in light of their pending summary judgment motion.  The McBrides contend that granting Wilson-Sauls leave to file her FAC at this

late date would unduly prejudice them because dispositive motions have been argued and a F&R is pending.

No responsive pleading had yet been filed by the United States or the other individual defendants and, as such, the amendment is authorized as a matter of right as to those defendants. Further, with respect to the McBrides, the court finds that the FAC will not cause undue prejudice and does not alter the outcome of the McBrides' pending summary judgment motion. Indeed, the FAC has omitted the conspiracy claim filed pursuant to 42. U.S.C. § 1985 against the McBrides, upon which the McBrides sought summary judgment. Further, the amended allegations do not prejudice the McBrides' summary judgment motion by virtue of saving a claim that would have been dismissed. Wilson-Sauls' request to file the FAC is granted.

## II.  Motion for Summary Judgment

The McBrides have moved for summary judgment on the following grounds: (1) Wilson-Sauls executed a release that applies to bar all the claims she presently asserts against them; (2) the claims against Daniel McBride are barred by the exclusive remedy provisions of the Federal Employee Compensation Act, 5. U.S.C. § 1816(c); (3) the court lacks jurisdiction over the claims against Sally McBride; (4) in regard to the claims based on violations of Wilson-Sauls' civil rights, there are no genuine issues of fact,

and the McBrides are entitled to judgment as a matter of law; and (5) Daniel McBride is entitled to qualified immunity.

## A. Legal Standard

When considering a motion for summary judgment, the court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Freeman v. Arpaio</u>, 125 F.3d 732, 735 (9th Cir. 1997). Summary judgment is appropriate if, after viewing the evidence in the light most favorable to the non-moving party, the court determines that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(e); <u>Vander v. United States Dept. of Justice</u>, 268 F.3d 661, 663 (9th Cir. 2001). The "materiality" of facts is determined by looking to the substantive law that defines the elements of the claim. <u>See</u> <u>Anderson</u>, 477 U.S. at 248.

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The moving party must persuade the court through "pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, . . . that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only after the moving party has made such a showing does the burden shift to the non-moving party to show that a genuine issue of material fact remains.  <u>See</u> Fed. R. Civ. P. 56(e).

### B. Settlement and Release Agreement

As stated above, the McBrides contend that all of Wilson-Sauls' claims are barred by the Settlement and Release Agreement (SRA).  According to the McBrides, the SRA, signed by Wilson-Sauls, released them from any claim or cause of action she many have against them.  Further Wilson-Sauls returned $4200 to the McBrides. In exchange, the McBrides vacated the rental premises owned by Wilson-Sauls and released her from any claims they may have against her.

Wilson-Sauls responds that, by its plain language, the SRA does not apply to the claims asserted here.  Rather, the SRA is limited to issues "with respect to the property located at 81808 Moorlando Lane."[1]  Alternatively, even if the SRA did cover the

---

[1]   Relevant provisions of the SRA are as follows:

  1.   <u>RECITALS</u>

      . . . .

          Whereas the parties wish to resolve fully, completely and finally, all issues of dispute that now exist or in the future may exist with respect

dispute here, the release is unenforceable because it was not voluntary.  On the contrary, Wilson-Sauls insists that the SRA "was the product of coercion, duress and physical and psychological intimidation."

The parties agree that whether the SRA, signed by Wilson-Sauls, was voluntary, deliberate and informed depends on the factors set forth in <u>Stroman v. West Coast Grocery</u>, 884 F.2d 458, 462 (9th Cir. 1989):  (1) the degree of clarity and lack of ambiguity in the agreement; (2) plaintiff's education and business experience;(3) whether there was a non-coercive atmosphere

_____

> to the property located at 81808 Moorlando Lane except as specifically listed below.

> 2.    <u>RELEASE OF ALL CLAIMS</u>
>
>       For and inconsideration of the payments and other covenants set out below, both parties to this agreement hereby release and forever discharge the other party from any and all claims, demands or damages, actions or causes of action and/or suits of any kind or nature whatsoever, both known or unknown, which have resulted in the past or through the dates of this agreement, except claims to enforce the agreement.
>
>       . . . .

> 6.    <u>RELEASE AS A DEFENSE</u>
>
>       The Parties agree that if any action or claim release herein is ever asserted by any party herein against any of the Parties released by the terms of this Settlement Agreement, then the Release contained in this Settlement Agreement may be asserted or pled as a defense to any such action or claim.

surrounding the execution of the agreement; and (4) whether the employee had the benefit of legal counsel. Under <u>Stroman</u>, whether a release is voluntary, deliberate and informed is a factual inquiry which must be determined on a case by case basis considering the totality of the circumstances surrounding the execution of the release. <u>Id</u>.

Wilson-Sauls has presented evidence from which a reasonable jury could find that the SRA was not valid. There remain material issues of fact concerning, among others, the effects of Wilson-Sauls' brain injury, the events precipitating the McBrides' possession of her home, the allegedly coercive influence of the McBrides, and the extent of counsels' involvement in the drafting and execution of the SRA. The McBrides are not entitled to judgment as a matter of law that the SRA applies to bar Wilson-Sauls' claims against them in this action and their motion on this ground should be denied.

### C. Federal Employee Compensation Act

Next, the McBrides argue that Wilson-Sauls' claims resulting from the February 2005 accident are barred by the exclusive remedy provision of the Federal Employee Compensation Act (FECA).

Section 8116(c) of FECA provides:

The liability of the United States or an instrumentality thereof under this subchapter or any extension thereof with respect to the injury or death of an employee is exclusive and instead of all other liability of the of the United States or

the instrumentality to the employee, his legal representative, spouse, dependents, next of kin, and any other person otherwise entitled to recover damages from the United States or the instrumentality because of the injury or death in a direct judicial proceeding, in a civil action, or in admiralty, or by an administrative or judicial proceeding under a workmen's compensation statute or under a Federal tort liability statue.

5 U.S.C. § 8116(c).

Pursuant to FECA, federal employees are compensated for injuries sustained during the performance of their duties.  See 5 U.S.C. § 8102 (statute covers injuries that occur "while in the performance of [one's] duty); see also Figueroa v. United States, 7 F.3d 1405, 1407 (9th Cir. 1993).  As set forth above, the remedies provided under FECA are exclusive of all other remedies against the United States for job-related injury or death.  See 5 U.S.C. § 8116(c); Figueroa, 7 F.3d at 1407.  FECA claims present two questions: (1) is the injury within the scope of FECA, and (2) is plaintiff entitled to compensation under the facts of her case. Figueroa, 7 F.3d at 1407.  With respect to the first question regarding the scope of coverage, "[i]f a plaintiff has a colorable claim under FECA, the federal courts should dismiss any action arising under the same facts for lack of subject matter jurisdiction."  Moe v. United States, 326 F.3d 1065, 1068 (9th Cir. 2003).

As a threshold matter, Wilson-Sauls contends that section 8116(c) does not apply to her claims against the McBrides because

they are neither the "United States" nor an "instrumentality thereof."  In addition, Wilson-Sauls argues that because her claims are primarily claims for the emotional distress caused by the alleged intimidation, psychological injuries instead of physical harm, they are not subject to FECA preemption.  See, e.g., Moe, 326 F.3d at 1068.

With respect to Wilson-Sauls' argument that the McBrides are neither the "United States" nor an "instrumentality thereof," the court notes that several appeals courts have considered the issue directly and have held that FECA bars a federal employee's suit against the United States or its instrumentalities but does not bar a federal employee's suit against individual co-employees.  See, e.g., Allman v. Hanley, 302 F.2d 559, 563 (5th Cir. 1962) (FECA does not bar suits against fellow employees); see also Heathcoat v. Potts, 790 F.2d 1540, 1543-44 (11th Cir. 1986) (FECA "is silent on the matter of co-employee suits," following Allman); Bates v. Harp, 573 F.2d 930, 935 (6th Cir. 1978) ("[E]ven though we are not persuaded that co-employee suits are advisable as a matter of policy, in light of the overwhelming authority in support of such suits, absent an explicit statutory bar to the contrary, we feel constrained to follow the holding of Allman."); Davis v. Harrod, 407 F.2d 1280, 1282 n.2 (D.C.Cir. 1969) ("[U]nder the FECA it appears that appellant[] could sue [her co-employee], but not the District.").

Notably, the Ninth Circuit has not directly ruled on this question and this court declines to reach the issue at this time. Instead, the court determines FECA is not a bar to Wilson-Sauls' claims because a claim for FECA compensation must result from physical injury. "Emotional injury, divorced from any claim of physical harm, is outside FECA's scope." <u>Moe</u>, 326 F.3d at 1068 (quotations and citation omitted). FECA is inapplicable here because Wilson-Sauls does not allege that the McBrides' actions after the February 2005 accident resulted in physical injury.

Moreover, the McBrides have failed to establish as a matter of law that the incidents upon which Wilson-Sauls relies for her claims against the McBrides were job-related. Indeed, the allegations against the McBrides begin after the February 2005 accident and relate exclusively to conduct that occurred away from the Depot. Wilson-Sauls has stated repeatedly, in her pleadings and at oral argument, that she seeks to hold the McBrides liable only for the events that occurred following the February 2005 accident. In response, the McBrides have insisted that they were not acting either as government employees or on behalf of the government during the events in dispute. On this record it is unclear that the allegations against the McBrides are covered by FECA as a matter of law and, therefore, summary judgment on the ground that FECA provides the exclusive remedy for Wilson-Sauls' claims should be denied.

For the first time in their reply brief, and at oral argument, the McBrides argue that Wilson-Sauls' Oregon common law tort claims are barred by the Federal Torts Claim Act (FTCA). Interestingly, in order to assert the FTCA as a bar to the McBrides' state law claims, the McBrides must argue that they were acting within the scope of their employment by the government, a status that they expressly denied in their Concise Statement of Material Facts (CSMF). See, e.g., CSMF at 3 ("Mr. McBride was acting solely as friend and not as a government employee.")

The FTCA is a waiver of the federal government's sovereign immunity and allows the United States to be sued for certain torts, including claims for personal injury or death caused by the negligent or wrongful act of an employee of the United States who was acting within the scope of his employment. See 28 U.S.C. § 1346(b)(1).[2] The FTCA grants exclusive jurisdiction to district

---

[2]     28 U.S.C. § 1346(b)(1) provides:

Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

courts for a claim against the United States for torts committed by federal employees while acting within the scope of employment. 28 U.S.C. § 1346(b)(1); <u>Williams v. United States</u>, 350 U.S. 857 (1955). The purpose of the FTCA is to remove the personal liability of federal employees for common law torts committed within the scope of their employment, with the exclusive remedy for such torts being FTCA actions against the United States. <u>See</u> <u>Billings v. United States</u>, 57 F.3d 797, 799-800 (9th Cir. 1995) (citing H.R.Rep. No. 700, 100th Cong., 2d Sess. 4 (1988)).

When a federal employee has been sued, the Attorney General may certify that the employee was acting within the scope of his or her office. <u>See</u> 28 U.S.C. § 2679(d)(1). Once the Attorney General has done so, the United States must be substituted as a party and the employee dismissed from the action. 28 U.S.C. § 2679(b)(1); 28 U.S.C. § 2679(d)(1). The Attorney General has the right to decide the scope of employment issue in the first instance, and his or her certification is "conclusive unless challenged." <u>Green v. Hall</u>, 8 F.3d 695, 698 (9th Cir. 1994). There is no evidence before the court that the United States Attorney for the Department of Justice in the District of Oregon has certified that the McBrides were acting within the scope of employment as an employee of the United States at the time of the incidents out of which this suit arose.

Generally, whether a particular defendant is covered under the FTCA requires a two part analysis. First, whether defendant is a

federal employee is based on federal law.  <u>Pattno v. United States</u>, 311 F.2d 604, 605 (10th Cir. 1962).  Second, whether the employee was acting within the scope of his employment is analyzed under the law of respondeat superior of the state where the injury occurred.  <u>Williams</u>, 350 U.S. at 857; <u>see also</u> <u>McLachlan v. Bell</u>, 261 F.3d 908, 911 (9th Cir. 2001).

Under Oregon law, whether an employee has acted within the scope of employment at any given time generally is a question for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the facts pled.  <u>Stanfield v. Laccoarce</u>, 284 Or. 651, 655, 588 P.2d 1271 (1978).  The proper inquiries are:  "(1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform."  <u>Chesterman v. Barmon</u>, 305 Or. 439, 442-443, 753 P.2d 404 (1988).

There are material questions of fact regarding whether McBride was acting within the scope of his employment at the time of the incidents from which the state tort claims arose.  These questions must be resolved by a trier of fact before a determination can be made whether the FTCA is the exclusive remedy for Wilson-Sauls' state law tort claims.  The McBrides request for summary judgment on the ground that FTCA provides the exclusive remedy for Wilson-

Sauls' Oregon common law tort claims should be denied.

**D.    Subject Matter Jurisdiction**

Next, the McBrides argue that Wilson-Sauls' claims against Sally McBride are barred for lack of subject matter jurisdiction. The McBrides contend that Wilson-Sauls' claims against Sally McBride are not work-related claims, i.e., the claims that provide original jurisdiction occurred after the accident at issue and, therefore, cannot be so related that they form part of the same case or controversy.

Supplemental jurisdiction over Sally McBride exists if the claims are so related to the federal claims that they form the same case or controversy.  See 28 U.S.C. § 1367(a).  Section 1367(a) grants this court supplemental jurisdiction over claims which are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Id.  In addition, the statute expressly authorizes the inclusion of claims involving additional parties.  Id.

After a careful review of the FAC filed in this case, the court finds that supplemental jurisdiction is present over Wilson-Sauls' claims against Sally McBride.  There can be no dispute that the conduct for which Wilson-Sauls seeks to attach liability to Sally McBride are closely related to her claims providing original jurisdiction over Daniel McBride, i.e., Bivens.  The McBrides'

request for summary judgment for the claims against Sally McBride
for lack of subject matter jurisdiction should be denied.

**E.    42 U.S.C. § 1983**

The McBrides seek an entry of judgment against Wilson-Sauls'
claim pursuant to 42 U.S.C. § 1983 for a  violation of her
substantive due process rights under the Fifth and  Fourteenth
Amendments to be free from state-created danger.  The McBrides
insist that Wilson-Sauls' section 1983 claim fails because there
are no allegations of conduct committed by a person acting under
the color of state law.  As an employee of the Depot, owned and
operated by the federal government, Daniel McBride could not have
been acting under the color of state law on February 11, 2005.  Nor
was he acting in his official capacity with respect to Wilson-Sauls
after the February 2005 accident.  Instead, Daniel McBride insists
he was acting solely as a friend, not a government employee.

Alternatively, the McBrides contend that Wilson-Sauls' section
1983 claim must fail because Daniel McBride was a fellow security
officer and did not have any supervisory duties over, Wilson-Sauls,
Holloman or any other Depot employee.  Nor did Daniel McBride have
any personal knowledge that Holloman suffered from mental or
emotional problems or was a threat to his co-workers.

To establish a prima facie case under 42 U.S.C. § 1983,
plaintiff must allege two elements:  (1) that a right secured by

the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

It is undisputed that federal employees, like private individuals, can act under color of state law if they conspire or act in concert with state officials to deprive a person of her civil rights.  Billings, 57 F.3d at 801; see also Lopez v. Dep't of Health Services, 939 F.2d 881, 883 (9th Cir. 1991); Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989).  Action under color of state law has been interpreted to mean "misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  Billings, 57 F.3d at 801 (quotations and citation omitted) (9th Cir. 1995).

Federal officials, however, do not become "state actors" unless "[t]he State . . . has so far insinuated itself into a position of interdependence with . . . [the federal officials] that it must be recognized as a joint participant in the challenged activity. . . ."  Kletschka v. Driver, 411 F.2d 436, 449 (2d Cir. 1969)(quotations and citation omitted).  To transform a federal official into a state actor, a plaintiff must show that federal and state officials engaged in a conspiracy or "symbiotic" venture to violate a person's rights under the Constitution or federal law.  Cabrera v. Martin, 973 F.2d 735, 742-743 (9th 1992) ("To transform a federal official into a state actor, the appellees must show that

there is a "symbiotic relationship" between the [federal defendants] and the state such that the challenged action can "fairly be attributed to the state."); <u>Kali v. Bowen</u>, 854 F.2d 329, 331 (9th Cir. 1988) ("[T]he plaintiffs make no allegation that federal and state officials conspired so that the actions taken by the federal officials could be deemed to have been 'under color of state law'. . . ."); <u>Gibson v. United States</u>, 781 F.2d 1334, 1343 (9th Cir. 1986)("Federal officers acting under federal authority are immune from suit unless the state or its agents significantly participated in the challenged activity."); <u>Johnson v. Orr</u>, 780 F.2d 386, 390 (3rd Cir. 1986); <u>Knights of the Ku Klux Klan v. East Baton Rouge Parish School Bd.</u>, 735 F.2d 895, 900 (5th Cir. 1984) ("Ordinarily, when federal officials conspire or act jointly with state officials to deny constitutional rights, 'the state officials provide the requisite state action to make the entire conspiracy actionable under section 1983.'"); <u>Askew v. Bloemker</u>, 548 F.2d 673, 678 (7th Cir. 1976) ("[I]f plaintiffs are to rely on the concert-of-action theory enunciated in <u>Kletschka v. Driver</u>, [411 F.2d 436 (2d Cir. 1969)], the [plaintiffs] must at least have alleged a conspiracy between the named defendants and these state officials as a basis for their § 1983 claim.").

Wilson-Sauls alleges in her FAC that Daniel McBride and others acted under color of state law to violate her substantive due process rights under the Fifth and Fourteenth Amendment to be free

from state-created danger. She further alleges with respect to "color of state law" that the federal government "operates the Umatilla Army Depot within the State of Oregon and under the auspices of the U.S. Army Chemical Materials Agency in partnership or as a joint enterprise with the State of Oregon." FAC at 2. Finally, Wilson-Sauls alleges that Daniel McBride is "sued for actions taken after the February [] 2005 accident."

The court finds that Wilson-Sauls' allegations of "color of state law" are inadequate as a matter of law. To establish a connection between Daniel McBride and the State, Wilson-Sauls makes only a bare allegation that the Depot operates within the State of Oregon and pursuant "to the joint enterprise/partnership operation of the Umatilla Army Depot by the United States and the State of Oregon." FAC at 5. These allegations fail to satisfy the requisite showing that Daniel McBride conspired or acted in concert with Oregon officials to deprive Wilson-Sauls of her civil rights. Nowhere either in the FAC or in the pleadings in opposition to summary judgment does Wilson-Sauls allege that the State of Oregon cloaked Daniel McBride, a federal employee, in any degree of state authority. Nor do the facts presented in the FAC support such a conclusion. To the contrary, it is undisputed that Daniel McBride was employed by the federal government and that the Depot is a United States Army installation –– a federal army base patrolled by federal officers and operated with the support of the United States

Army Chemical Materials Agency and not a state, county, or municipality.

Similarly, Wilson-Sauls also fails to allege there was a conspiracy between state officials and Daniel McBride to deprive her civil rights. Nowhere in either the FAC or any of the pleadings does Wilson-Sauls offer evidence to demonstrate that state officials and Daniel McBride reached an understanding to deny Wilson-Sauls her Constitutional rights. Instead, the facts in the record, including the FAC, establish that Daniel McBride's actions were allegedly taken under color of *federal* law. Indeed, Wilson-Sauls' challenge to Daniel McBride's conduct in violation of her Constitutional right turns on whether he was acting as an employee of the Depot -- a federal employee on federally assigned duty.

Finally, beyond the bare allegation, Wilson-Sauls did not offer any evidence of a "joint enterprise/partnership" in operation of the Umatilla Army Depot between the United States and the State of Oregon. The court is left to speculate as to the precise nature of the alleged relationship and the extent of the State of Oregon's involvement, if any, in the daily operation of the Depot. A mere conclusory statement of such joint operation, without more, does not convert the McBrides' alleged conduct to "under color of state law." Other than a bare allegation in her FAC, Wilson-Sauls

presents no evidence of joint participation between McBride and the State of Oregon in the challenged activity. The court finds that Wilson-Sauls' section 1983 against Daniel McBride should fail as a matter of law.

### F.    42 U.S.C. § 1985

The McBrides request for summary judgment against Wilson-Sauls' conspiracy claim pursuant to 42 U.S.C. § 1985 should be denied as moot because it has been dismissed by Wilson-Sauls pursuant to her FAC.

### G.    Bivens Claim

Finally, the McBrides contend that Wilson-Sauls' claim pursuant to <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388 (1971), must fail on the merits.  According to the McBrides, "[a]t no time was Mr. McBride acting as a federal employee in relation to plaintiff after her February [] 2005 accident. . . .  Mr. McBride was never directed to help plaintiff by his superiors at the Depot. . . . Neither was Mr. McBride paid by the Depot to help care for plaintiff."  Reply in Support of Defendants Motion for Summary Judgment at 11.

Under the authority of the United States Supreme Court's decision in <u>Bivens</u>, a violation of the Fourth Amendment by a federal agent acting under color of his authority gives rise to a cause of action for damages despite the absence of any federal

statute creating liability. 403 U.S. 388. To state a private cause of action under <u>Bivens</u> and its progeny, plaintiff must allege: (1) that a right secured by the Constitution of the United States was violated, and (2) that the alleged deprivation was committed by a federal actor. <u>Van Strum v. Lawn</u>, 940 F.2d 406, 409 (9th Cir. 1991)(Section 1983 and <u>Bivens</u> actions are identical except for the replacement of a state actor under section 1983 by a federal actor under <u>Bivens</u>.).

Here, Wilson-Sauls alleges that Daniel McBride and others acted jointly and in concert to violate her rights under the Fourth and Fifth Amendments. The Fourth and Fifth Amendments, respectively, guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. CONST. amend. IV, and the right not to be deprived of property without "due process of law." U.S. CONST. amend. V. The Fourth Amendment can apply in the civil context, and is not confined to a seizure that results from a search. <u>Soldal v. Cook</u>, 506 U.S. 56, 67-68 (1992). A seizure of property within the meaning of the Fourth Amendment can occur when "there is some meaningful interference with an individual's possessory interests in that property." <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984); <u>accord</u> <u>Soldal</u>, 506 U.S. at 61. In order to be actionable a seizure of property must be objectively unreasonable. <u>Soldal</u>, 506 U.S. at 71. One of the important factors a court must consider

when reviewing an alleged Fourth Amendment claim is whether the property owner received due process.  Due process requires that persons whose property interests are at stake be afforded "notice and an opportunity to be heard." <u>Dusenbery v. United States</u>, 534 U.S. 161, 167 (2002).

The crux of Wilson-Sauls' Fourth and Fifth Amendment claims is that Daniel McBride acted unlawfully when he entered her home under the auspice of caring for her, intimidated her and attempted to take her home, her real property and her automobile.  According to Wilson-Sauls, it was the government sponsorship of the McBrides that gained them entry to her home and the opportunity to deprive her of her safety and property.  Wilson-Sauls has provided some evidence that McBride was paid by the Depot to transport her from the hospital to her home; that defendant Lazor told Wilson-Sauls that the Depot would provide someone to care for her when she returned from the hospital and that the McBrides were going to serve that function; that McBride and his wife were hired by the Depot to care for her at home during her recuperation; that defendant Lazor was aware that the McBrides had moved into Wilson-Sauls house under the auspice of caring for her on behalf of the Depot.

Viewing the facts in the light most favorable to Wilson-Sauls,

the court finds the McBrides are unable as a matter of law to establish that Wilson-Sauls' _Bivens_ claim fails on the merits. There are material issues of fact with respect to when and whether the McBride's were acting as employees or agents of the United States; and whether they unlawfully took her property pursuant to their authority as employees or agents of the United States. Wilson-Sauls has presented some evidence from which a reasonable jury could find that at some times each of the McBrides was acting as an agent or employee of the government; that Wilson-Sauls was removed from her property by the McBrides; and, that she signed over ownership to the McBrides under duress. There is no doubt that Wilson-Sauls faces a significant challenge to prevail at trial on her _Bivens_ claim, but she has survived summary judgment. As a result, the McBrides are not entitled to summary judgment on Wilson-Sauls' claim pursuant to _Bivens_ at this juncture.

### H.   Qualified Immunity

Wilson-Sauls brought a _Bivens_ action against Daniel McBride for his conduct as an employee of the federal government. As such, Daniel McBride claims he is entitled to qualified immunity shielding him from liability for civil damages. Specifically, Daniel McBride argues that all challenged conduct was personal in nature and not at the direction of the Depot; his conduct did not rise to the level of a Constitutional violation; alternatively, his actions did not violate a clearly established Constitutional

right; and, he was unaware his actions would violate the Constitution.

Qualified immunity shields government officials from liability for civil damages if their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To survive summary judgment it is not enough for plaintiffs to allege a deprivation of their liberty interests. Backlund v. Barnhart, 778 F.2d 1386, 1389 (9th Cir. 1985). Plaintiffs must plead and prove that defendants "violated a particular clearly established right." Id. In the Ninth Circuit, "[t]he qualified immunity test necessitates three inquiries: (1) the identification of the specific right allegedly violated; (2) the determination of whether that right was 'so clearly established' as to alert a reasonable officer to its constitutional parameters; and (3) the ultimate determination of whether a reasonable officer could have believed lawful the particular conduct at issue." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991).

Viewing the facts in the light most favorable to Wilson-Sauls, the crux of Wilson-Sauls' Fourth and Fifth Amendment claims, as stated above, is that Daniel McBride acted unlawfully when he entered her home under the auspice of caring for her on behalf of the Depot; intimidated her both physically and psychologically; and attempted to take her home, her real property and her automobile.

Under these circumstances, interference with an individual's possessory interests in property by a federal actor, the parameters of the Fourth and Fifth Amendments were well-established. See, e.g., Soldal, 506 U.S. at 67-68; Jacobsen, 466 U.S. at 113; Dusenbery, 534 U.S. at 167. The court finds that a reasonable public official would have been cognizant of those rights during the time period in question. Thus, in 2005, Daniel McBride should have been aware of Wilson-Sauls' right to be free from an unlawful interference with her possessory interests in her property by a federally authorized actor and her right to due process in the event her property interests were impaired. On this record Daniel McBride has failed to established his entitlement to qualified immunity. Accordingly, summary judgment against Wilson-Sauls' Bivens claim should be denied.

## CONCLUSION

Based on the foregoing, Wilson-Sauls' Motion to File Amended Complaint and to Correct Caption (doc. #66) is GRANTED; the McBrides Motion for Summary Judgment (doc. #38) should be GRANTED, in part, and DENIED, in part. Judgment should be entered against Wilson-Sauls' claim pursuant to 42 U.S.C. § 1983, and that claim should be DISMISSED

DATED this 9th day of November, 2007.

/s/Donald C. Ashmanskas
                    Donald C. Ashmanskas
                 United States Magistrate Judge




**SCHEDULING ORDER**

    The above Findings and Recommendation will be referred to a
United States District Judge for review.  Objections, if any, are
due November 26, 2007.  If no objections are filed, review of the
Findings and Recommendation will go under advisement on that date.
If objections are filed, a response to the objections is due
fourteen days after the date the objections are filed and the
review of the Findings and Recommendation will go under advisement
on that date.