IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBIN R. WILSON-SAULS,

                    Plaintiff,

          v.

MICHELLE D. CURTIS; LEROY B.
HAINS; RONALD R. HAERTLING;
LTC DAVID E. HOLLIDAY; BONNIE
ANN LAZOR; DANIEL McBRIDE;
SALLY McBRIDE; and UNITED
STATES of AMERICA,

                    Defendants.
_____

Civil No. 07-0163-AS

FINDINGS AND RECOMMENDATION

ASHMANSKAS, Magistrate Judge:

**PROCEDURAL HISTORY**

    Robin Wilson-Sauls filed a First Amended Complaint (FAC)

alleging federal and state claims against seven named individuals[1]

_____

        [1]    Counsel for the government represents the United States
and the following individual defendants, federal employees:
Michelle D. Curtis, Leroy B. Hains, Ronald R. Haertling, LTC
David E. Holiday and Bonnie Ann Lazor (collectively Federal

1 - FINDINGS AND RECOMMENDATION                                    [LB]

and the United Sates of America, arising from injuries she sustained on February 11, 2005, while working as a security guard at the Umatilla Army Depot, and events that occurred over the proceeding months. With the exception of Sally McBride who is sued only in her individual capacity, all individuals are sued in both their official and individual capacities. In addition, Wilson-Sauls' claims against the McBrides arise from conduct occurring only after the February 11, 2005 incident.

In Count One of her FAC Wilson-Sauls alleges that the Federal defendants and Daniel McBride acted jointly and in concert to violate her civil rights under the Fourth and Fifth Amendments and are liable to her pursuant to <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388 (1971). In Count Two of her FAC Wilson-Sauls alleges that the Federal defendants and Daniel McBride, acting under color of state law, violated her right under the Fifth and Fourteenth Amendments to be free from state-created danger in violation of 42 U.S.C. § 1983. Wilson-Sauls requests attorney fees pursuant to 42 U.S.C. §1988, for the violations of her civil rights under <u>Bivens</u> and section 1983. In Count Three of her FAC Wilson-Sauls seeks relief against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2674, for negligence and intentional infliction of emotional distress under Oregon law. In Count Four of her FAC

---

defendants). Daniel McBride, a federal employee, and Sally McBride (collectively McBrides) are represented by private counsel.

Wilson-Sauls alleges violations of Oregon common law for negligence, assault and battery, breach of fiduciary duty and intentional infliction of emotional distress against all individual defendants. Finally, in Count Five of her FAC Wilson-Sauls seeks declaratory relief through a determination by the court that the Federal Employees' Compensation Act is not her sole remedy against the United States; and she seeks equitable relief through a determination by the court that she is entitled to job training, job relocation and that the United States is required to purchase her residence.

The United States and the Federal defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment, seeking dismissal of Wilson-Sauls claims under <u>Bivens</u>, section 1983 and all tort claims against the Federal defendants. For the reasons that follow, the United States and the Federal defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment, should be granted, in part, and denied, in part.

### STATEMENT OF FACTS

The following recitation of facts is based on the parties' Concise Statement of Material Facts and the supporting declarations and exhibits.

Wilson-Sauls, Michelle D. Curtis, Leroy B. Hains, Ronald R. Haertling, LTC David E. Holiday, Bonnie Ann Lazor were all federal

employees employed at the Umatilla Chemical Depot (Depot) at the time of the incident out of which this action arose.

The Attorney General, through the United States Attorney for the District of Oregon, has certified that Curtis, Hains, Hartling, Holiday and Lazor were federal employees acting within the scope of their employment at the time of the incident out of which this action arose.

Michael C. Holloman was also a federal employee who was working at the Depot at the time of the incident out of which the action arose. However, Holloman had been permanently disqualified from his job more than one year prior to the February 11, 2005 incident.

On December 17, 2004, Wilson-Sauls reported to her supervisor, LTC Hains, that Holloman was tailgating her as she was driving to work. Wilson-Sauls provided a statement of the incident to LTC Hains. LTC Hains documented the incident with a written report but Holloman refused to sign it. In an interview after the February 2005 incident, Wilson-Sauls described two tailgating incidents and stated that after Holloman was counseled about the tailgating he did not do it again.

During December 2004, Wilson-Sauls informed LTC Hains she did not like working with Holloman. Sometime in January 2005, LTC Hains asked both of them how they were getting along and neither one said they were having any problems. On the day of the

incident, February 11, 2005, LTC Hains observed Wilson-Sauls and Holloman getting along very well.

On February 11, 2005, while driving a security patrol vehicle in a secluded area of the Depot, Holloman drove a vehicle over Wilson-Sauls. In its investigation, the FBI was unable to determine whether Holloman intended to harm Wilson-Sauls or whether he accidentally drove over her with the Dodge 4x4 truck. A polygraph examiner concluded that Holloman was being deceptive when he said he did not "deliberately drive over [Wilson-Sauls]."

For purposes of this motion, Wilson-Sauls' counsel has stipulated that, in the past, Wilson-Sauls has received benefits from the Office of Workers Compensation Programs (OWCP). Recently, in documents provided to Wilson-Sauls' counsel from the government's counsel, OWCP has threatened to terminate Wilson-Sauls' benefits.

Wilson-Sauls was interviewed on April 12, 2005, approximately two months after the incident and the interview was tape recorded and transcribed.[2] Wilson-Sauls explained during the interview that on February 11, 2005, she was on security patrol with Holloman and

---

[2] Wilson-Sauls acknowledges that she was interviewed by Lazor, but challenges the authenticity and admissibility of the interview transcript because she was not under oath, was not represented by counsel and was recuperating from a traumatic brain injury at the time of the interview. Wilson-Sauls also challenges the relevance and materiality of her statements to the Federal defendants after the incident.

she had been driving all morning.  After lunch, she decided it was his turn to drive.  Wilson-Sauls stated that she could smell Holloman's offensive odor while she was driving but, once she got into the passenger seat where he had been sitting, she could no longer tolerate the smell.  After they completed a patrol, she told Holloman to pull over and stop the truck and she would look for some rocks.  She said this was an excuse because "any coworker knows I don't give a darn about looking for rocks out on that depot."

Wilson-Sauls stood in front of the truck, picked up a rock, and showed it to Holloman.  She then knelt down in front of the truck, with her back to the truck.  At that time, she was close enough to touch the truck.  She did not recall whether the engine was running.  When Wilson-Sauls saw the truck move, she leaped forward and stretched out, face down, on her stomach, and hoped the truck would pass over her.  Before she was hit, she recalled standing, with the truck in her peripheral vision, more than an arm's length away, and then she remembered being under the tire. Wilson-Sauls believed that Holloman intentionally ran over her with the truck.

In her April 2005 interview, Wilson-Sauls stated she had no more problems working with Holloman than she did working with anyone else.  On the day of the incident, a sergeant asked Wilson-

Sauls if she had a problem working with Holloman and she indicated that she did not.

In December 2001, Haertling was employed at the Depot. He worked at the Depot from December 2001 through October 2007. Sometime in 2005, Haertling became the Chief of Security. As Chief of Security Haertling was responsible, among other things, for supervising the three security guard shifts, which represented the 24-hour operation of the Security Unit at the Depot. He also managed the subordinate supervisors in charge of the individual shifts. Simply put, he was the supervisor and manager of the "uniform side" of the security force at the Depot. Haertling was responsible to make certain that security guard personnel were capable and qualified. Wilson-Sauls alleges that, beginning December 2001, Haertling was Holloman's supervisor. The Federal defendants deny that Haertling was Holloman's direct supervisor.

Haertling was also the certifying official for the "Chemical Personal Responsibility Program" (CPRP). The CPRP is the Army program that ensures that the security guards responsible for securing chemical weapons are qualified, reliable and proficient in the performance of their duties. In certifying security guards for the CPRP, Haertling is required to follow the Qualifying Factors set forth in Army Regulation 50-6 (also known as the Douglas factors). Those Qualifying Factors include: financial responsibility, medical ability, physical ability and mental

stability.  Financial stability is an important factor because a person with financial problems might present an opportunity to be coerced or blackmailed.  Mental stability is an important fact because it indicates a person who might be unreliable in a crisis situation.

Generally, a security guard who is under stress, has a mental condition and does not fulfill his job duty or instruction through the exercise of bad judgment would be a "red flag" to Haertling. In addition, Haertling testified that long-term depression "could be" a "red flag" as well.  The parties dispute whether the <u>Douglas</u> factors are used in CPRP qualifications.  The Federal defendants contend that they are used only to determine the appropriate level of discipline for federal civil employees.  <u>See</u> <u>Douglas v. Veterans Administration</u>, 5 M.S.P.B. 313, 5 M.S.P.R. 280 (1981).

In February 2005, and prior, a second certification, the "Security Clearance," was required for Depot security guards.  On or before February 2005, a Security Clearance was needed for "sergeants and above" in the security guard detail.  Further, in February 2005, and prior, there was an expectation that when a security guard sergeant was hired or promoted to sergeant, that person must be qualified for the CPRP and obtain a Security Clearance.

Security guards that were hired but did not qualify for the CPRP "were eventually removed."  However, if a security guard was

not able to obtain CPRP qualification, the guard was permitted to work in a unrestricted area of the Depot. On February 11, 2005, it was government policy that if a person could not qualify for the CPRP, the Depot would do a job search and if no job was found for that worker then the individual would lose his government job. Around February 2005, Haertling described his security staff as "shorthanded" and "never up to strength."

On February 11, 2005, Lazor was employed at the Depot as the Director of Law Enforcement and Security. Lazor describes her job: "Basically, it was to administer the Army regulations over the security program. . . ." On February 11, 2005, her immediate supervisor was LTC Holliday and below her in the chain of command was Haertling.

Lazor testified that when a security guard was hired prior to February 11, 2005, there was an expectation that he or she would qualify under the CPRP. On that day, the Depot was understaffed with CPRP guards. Lazor acknowledged it was her and Haertling's jobs to make "sure all my employees [were] capable and able to work and perform their job duties."

On May 1, 2001, Hains began at the Depot as a security guard. He was eventually promoted to lieutenant. After a little over a year as a lieutenant, Hains was promoted again as temporary shift captain. Subsequently, the temporary appointment to shift captain became permanent.

On the day of the incident, Hains was on duty as acting shift captain. He had oversight of all employees performing the security duties. He determined who did what tasks for that day and paired security guards Holloman and Wilson-Sauls to work together. On February 11, 2005, Holloman and Wilson-Sauls reported directly to Hains with Hains' immediate supervisor being Haertling.

One purpose of the CPRP was to have "safe and reliable people working on the [D]epot." Hains testified that "qualifying for the CPRP is a condition of employment." On February 11, 2005, they were shorthanded in personnel to fulfill the CPRP guard slots.

Holloman was hired as a chemical weapons security guard at the Depot in late 2002. Shortly after Holloman was hired, he was given

> temporary clearance or an interim clearance and put in the
> CPRP because there were some issues that came back on the
> fact-find investigation about his finances that were some --
> of concern. It indicated that he may have some financial
> irresponsibility, debts that were not up to date. It seems
> like there were some other issues in there about being fired
> from another position or something like -- a job or two.

Haertling Deposition at p. 47, ln. 13-21.

After he was in the program for about six months on an interim clearance, the Depot ran another credit check and discovered that Holloman's credit was worse than before. Wilson-Sauls alleges that, at that point, Holloman was temporarily disqualified from obtaining a Security Clearance and CPRP certification. The Federal defendants dispute this allegation and contend that Holloman was not temporarily disqualified from obtaining a Security Clearance.

Holloman was promoted to sergeant sometime after Haertling began his employment at the Depot.  The Federal defendants acknowledge that a Security Clearance and a CPRP qualification are necessary to do the full range of work as a security guard at the Depot.

The parties dispute whether Holloman ever received a Security Clearance or CPRP certification.  While Wilson-Sauls alleges Holloman never obtained either designation, the Federal defendants maintain that Holloman received an interim Security Clearance and, at one point, was qualified under the CPRP.

In his deposition, Haertling described an early incident with Holloman refusing to wear or carry his protective mask when he was in the "limited area," the location where the chemical munitions were stored.  Haertling also testified about an incident in which Holloman was written-up for following Wilson-Sauls too closely in his vehicle.

In September 2002, Holloman refused to go on call where shots were fired.  While Haertling dismissed Holloman's refusal as being "lazy", Haertling was aware that Holloman may just choose "not to do his job."

Holloman has a known history of depression, admitted abuse of steroids, financial difficulties and incidents of failure to follow the orders of superiors.  Haertling was aware that Holloman had a history of depression and was taking medication for that condition.

The parties dispute whether Holloman was disciplined for driving too close to Wilson-Sauls in December 2004. According to Wilson-Sauls, Holloman was disciplined and Haertling could have suspended his driving privileges, but declined to do so. The Federal defendants explain that a letter of counseling was placed in Holloman's file, but he was not disciplined.

Wilson-Sauls alleges that at some point Holloman was permanently disqualified from the CPRP. Subsequently, Haertling reviewed Holloman's file and determined he would not certify him as a "permanent clearance" in the CPRP. According to Wilson-Sauls, Holloman was never certified in the CPRP while he was at the Depot, nor did he ever receive a Security Clearance.

Haertling testified that Holloman worked for the roads and grounds people for eight or nine months until

> Holliday decided he didn't want him working there anymore, he wanted him brought back to security. And so we ended up having him back, and we found odd jobs for him to do, cleaning up around the area. And when we no longer had other things for him to do, we -- assigned him -- I assigned him to ride along as -- in a patrol.

Haertling Deposition at p. 52, ln. 17-23. This return to patrol occurred sometime prior to the beginning of 2005.

Additionally, after Holloman returned to security, he was not permitted to carry a weapon because of "his failure to . . . get his credit under control . . . conflicts that he'd had with other personnel on the guard force . . . ."

12 - FINDINGS AND RECOMMENDATION                              [LB]

Wilson-Sauls alleges that both Haertling and Lazor had the authority to fire Holloman on February 11, 2005. The Federal defendants dispute that and insist that Holloman could only be terminated through an administrative procedure.

Haertling testified that prior to 2005 he had all the information needed to permanently disqualify Holloman from the CPRP and the security guard position. In fact, according to the Federal defendants, Holloman was permanently disqualified from the CPRP at the time. While Haertling could have proposed the removal of Holloman as a security guard, Holloman could be terminated only through an administrative procedure. Nevertheless, Haertling returned Holloman to the "security detail." Haertling testified that Holloman was acting as a "rider -- eyes and ears with the other guard." Haertling defined rider as a "second patrol or second person in the vehicle."

Despite being referred to as a "rider," Holloman was paid as a security guard. Further, Holloman was allowed to drive government vehicles just as a security guard was permitted. Nor was there a change of circumstances or improvement in performance in the situation that caused Haertling to place Holloman back on patrol. On February 11, 2005, Holloman was the only security guard "limited to acting as riders." Haertling wanted Holloman terminated. Haertling admitted that on February 11, 2005, the day

of the incident involving Wilson-Sauls, he was responsible for Holloman.

On February 11, 2005, Hains defined Holloman's job as a "security guard." At his deposition, Hains described how Holloman and Wilson-Sauls came to be assigned to work together that day:

> They were scheduled to work with one another. When a shift supervisor comes on , there's a scheduling sheet, and what the shift sergeant will do is they'll go and try to split it up to ensure that we rotate people around so they don't always have the exact assignments. And so they provide us with that, and we go over it. And then we would go out and give a guard mount briefing and tell people where they were assigned.

Hains was responsible for the decision to pair them on the day of the incident.

It was Hains who obtained the report from Wilson-Sauls that Holloman was driving too closely to her in his patrol car prior to this incident. He testified that to him this was a "safety concern." He documented the event in Holloman's personnel file and orally counseled Holloman. Hains believed the Security Personnel Department would be better served if Holloman was not employed there prior to February 11, 2005.

After receiving their guard assignments for that day, Holloman and Wilson-Sauls gathered their equipment and went out to patrol. Holloman was not permitted to carry a weapon or dress in uniform on February 11, 2005, because he was permanently disqualified. On that day, there were no other security guards working without uniforms or prohibited from carrying a weapon. Hains testified

that safety of "himself [Holloman] or others" and security were
additional reasons Holloman was not permitted to carry a weapon.

**LEGAL STANDARD**

Under Fed.R.Civ.P. 12(b)(6), once a claim has been stated
adequately, it may be supported by "showing any set of facts
consistent with the allegations in the complaint." Bell Atlantic
Corp. v. Twombly, ___ U.S. ___, 127 S.Ct. 1955, 1960 (2007). See
also Litchfield v. Spielberg, 736 F.2d 1352, 1357 (9th Cir. 1984).
For the purpose of the motion to dismiss, the complaint is
liberally construed in favor of the plaintiffs, and its allegations
are taken as true. Rosen v. Walters, 719 F.2d 1422, 1424 (9th Cir.
1983).When matters outside of the pleadings are considered by the
court, the motion to dismiss may be converted to a motion for
summary judgment. Fed.R.Civ.P. 12(d); Jacobson v. AEG Capital
Corp., 50 F.3d 1493, 1496 (9th Cir. 1995). "All parties must be
given a reasonable opportunity to present all the material that is
pertinent to the motion." Fed.R.Civ.P. 12(d).

As both parties have presented evidence outside the pleadings,
the present motion is more appropriately treated as one for summary
judgment. A party is entitled to summary judgment where there is
no genuine issue of material fact. Fed.R.Civ.P. 56(c). When
reviewing a motion for summary judgment, the court construes the
evidence--and any dispute regarding the existence of facts--in
favor of the party opposing the motion. Snead v. Metro. Prop. &

<u>Cas. Ins. Co.</u>, 237 F.3d 1080, 1086 (9th Cir. 2001).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  Thus, summary judgment will be mandated if the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" <u>Broussard v. Univ. of Cal. at Berkeley</u>, 192 F.3d 1252, 1258 (9th Cir. 1999)(quoting <u>Celotex</u>, 477 U.S. at 322).

## DISCUSSION

The Federal defendants have moved for summary judgment on the following grounds:  First, Wilson-Sauls' claim under <u>Bivens</u> should be dismissed because an adequate remedy exists under the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8101 *et seq*.  Thus, her claims are barred by the exclusive remedy provision of FECA. Alternatively, Wilson-Sauls' <u>Bivens</u> claim should be dismissed for failure to allege any facts to show a violation of either the Fourth or Fifth Amendment.

Next, the Federal defendants seek judgment against Wilson-Sauls' claim under section 1983 because the Federal defendants were not acting under color of state law.  Alternatively, Wilson-Sauls' section 1983 claim should be dismissed for failure to allege facts to show a state-created danger.

Thirdly, the Federal defendants request dismissal of Wilson-Sauls' Oregon common-law tort claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b); 2679(d), and substitution of the United States as the party defendant. Alternatively, the Federal defendants contend that Wilson-Sauls' tort claims must be dismissed on the ground that she can prove no facts to support the alleged torts.

## I.    Wilson-Sauls' Bivens Claim

As stated above, Wilson-Sauls alleges in her First Claim for Relief that the Federal defendants and Daniel McBride are liable under Bivens, 403 U.S. 388, for violating her rights under the Fourth and Fifth Amendments. The Supreme Court's decision in Bivens authorizes a suit for damages against federal officials for constitutional violations despite the absence of any federal statute creating liability. Id.

To state a private cause of action under Bivens and its progeny, plaintiff must allege: (1) that a right secured by the Constitution of the United States was violated; and (2) that the alleged deprivation was committed by a federal actor. Van Strum v. Lawn, 940 F.2d 406, 409 (9th Cir. 1991)(Section 1983 and Bivens actions are identical except for the replacement of a state actor under section 1983 by a federal actor under Bivens.).

Here, Wilson-Sauls alleges that the Federal defendants and McBride acted, jointly and in concert, to violate her rights under

the Fourth and Fifth Amendments.  The Fourth and Fifth Amendments,
respectively, guarantee "[t]he right of the people to be secure in
their persons, houses, papers, and effects, against unreasonable
searches and seizures," U.S. CONST. amend. IV, and the right not to
be deprived of property without "due process of law." U.S. CONST.
amend. V.  The Fourth Amendment can apply in the civil context, and
is not confined to a seizure that results from a search.  <u>Soldal v.</u>
<u>Cook</u>, 506 U.S. 56, 67-68 (1992).  In fact, "[i]t is well
established that the Constitution protects a citizen's liberty
interest in her own bodily security." <u>Kennedy v. City of</u>
<u>Ridgefield</u>, 439 F.3d 1055, 1061 (9th Cir. 2006).  With respect to
a Fifth Amendment violation, it is undisputed that a Federal
official may be liable for "damages for constitutional wrongs
engendered by [their] failure to adequately supervise or train
[their] subordinates." <u>Ting v. United States</u>, 927 F.2d 1504, 1512
(9th Cir. 1991).

Finally, many circuit courts, including the Ninth Circuit,
recognize a constitutional violation under a "state-created danger"
theory of liability.  <u>See</u>, <u>e.g.</u>, <u>Kennedy</u>, 439 F.3d at 1062-1063
(complaint adequately alleged state-created danger where plaintiff
reported to police that her neighbor was a child molester and the
police violated promises to patrol the neighborhood and to warn her
before they talked to the neighbor); <u>Wood v. Ostrander</u>, 879 F.2d
583, 589-90 (9th Cir. 1989) (plaintiff raised a genuine factual

dispute whether state trooper deprived her of a constitutional liberty interest by abandoning her, after impounding her vehicle, at night in a high-crime area, resulting in her rape by a stranger from whom she accepted a ride); Butera v. District of Columbia, 235 F.3d 637, 651 (D.C.Cir. 2001)(joining other circuits "in holding that, under the State endangerment concept, an individual can assert a substantive due process right to protection by the [state] from third-party violence when [state] officials affirmatively act to increase or create the danger that ultimately results in the individual's harm"); Kallstrom v. City of Columbus, 136 F.3d 1055, 1066-1067 (6th Cir. 1998)(City of Columbus' release of information from undercover officers' files to defense counsel, which substantially increased the vulnerability of the officers to private acts of vengeance, created a constitutionally cognizable state-created danger).

As a threshold matter the Federal defendants contend that Wilson-Sauls "has not alleged any facts which support[] her claim that her rights were violated by the individual defendants under either the Fourth or Fifth Amendment." Defendants' Memorandum of Law at 11. According to the Federal defendants, neither the conclusory allegations in her FAC nor the circumstances of the incident, as described by Wilson-Sauls in her interview, support Wilson-Sauls' constitutional claims.

The crux of Wilson-Sauls' constitutional claims is that the
Federal defendants acted unlawfully to place her in danger by the
"affirmative actions of permitting Mr. Holloman to continue working
at the Depot more than a year after his permanent disqualification
and permitting him to perform as a security guard in spite of his
checkered behavioral and disciplinary history, including his abuse
of drugs and his long-standing depression." Plaintiff's Memorandum
in Opposition at 26. According to Wilson-Sauls, it was the Federal
defendants' refusal to exclude Holloman from security guard duties
that directly caused her injuries.

Wilson-Sauls has provided some evidence that Holloman was
neither capable or qualified to work as a security guard at the
Depot; that in the year or so prior to the incident, Holloman had
been "permanently disqualified" from his duties as a security
guard; denied a Security Clearance to work at the Depot; relieved
of his weapon and his uniform; transferred to yard detail as a last
resort to provide him with a position at the Depot; and that the
Federal defendants were responsible for ensuring that Holloman was
capable and qualified to perform his work duties. In addition,
Wilson-Sauls presented evidence that on the day she was injured by
Holloman, the Depot was short-staffed for security guards. A
reasonable jury could conclude that, on the day of the incident,
Holloman was neither capable nor qualified, based both on his
personal profile and work history at the Depot and technical

requirements of the position, for the work duties to which he was assigned. Finally, there is no dispute that while Holloman was assigned to security detail on February 11, 2005, he ran over Wilson-Sauls with a government vehicle and caused life-threatening and permanent injuries. In its investigation, the FBI was unable to determine whether Holloman intended to harm Wilson-Sauls or whether he accidentally drove over her with the Dodge 4x4 truck. A polygraph examiner concluded that Holloman was being deceptive when he said he did not "deliberately drive over [Wilson-Sauls]."

A reasonable jury could find that Holloman was neither capable or qualified to work as a security guard; that he posed a significant risk to Wilson-Sauls; that the Federal defendants were aware of that risk; and that the Federal defendants disregarded that known risk when they assigned Holloman to work security with Wilson-Sauls on February 11, 2005. Viewing the facts in the light most favorable to Wilson-Sauls, the court finds the Federal defendants are unable as a matter of law to establish that Wilson-Sauls' Bivens claim fails on the merits. Wilson-Sauls has adequately alleged facts to support a claim that her constitutional rights were violated by the Federal defendants.

Next, the Federal defendants contend that, in any event, Wilson-Sauls' claims resulting from the February 11, 2005, incident are barred by the exclusive remedy provision of FECA and an action under Bivens should not extend to cover the circumstances here.

21 - FINDINGS AND RECOMMENDATION                                    [LB]

The Federal defendants rely on two Supreme Court decisions, <u>Bush v. Lucas</u>, 462 U.S. 367, 368 (1983) and <u>Wilkie v. Robbins</u>, 127 S.Ct. 2588 (2007), to argue that a claim under <u>Bivens</u> should not be permitted here.  The decision whether to permit a <u>Bivens</u> claim requires a court to consider:  (1) "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages;" and (2) "even in the absence of an alternative, . . . 'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation." <u>Wilkie</u>, 127 S.Ct at 2598 (quoting <u>Bush</u>, 462 U.S. at 378).  The Federal defendants insist that "a <u>Bivens</u> action should not be created as a remedy . . . because Plaintiff is being compensated under FECA."  Defendants' Memorandum of Law at 11.

Section 8116(c) of FECA provides:

The liability of the United States or an instrumentality thereof under this subchapter or any extension thereof with respect to the injury or death of an employee is exclusive and instead of all other liability of the of the United States or the instrumentality to the employee, his legal representative, spouse, dependents, next of kin, and any other person otherwise entitled to recover damages from the United States or the instrumentality because of the injury or death in a direct judicial proceeding, in a civil action, or in admiralty, or by an administrative or judicial proceeding under a workmen's compensation statute or under a Federal tort liability statue.

5 U.S.C. § 8116(c).

Pursuant to FECA, federal employees are compensated for injuries sustained during the performance of their duties. <u>See</u> 5 U.S.C. § 8102 (statute covers injuries that occur "while in the performance of [one's] duty"); <u>see</u> <u>also</u> <u>Figueroa v. United States</u>, 7 F.3d 1405, 1407 (9th Cir. 1993). As set forth above, the remedies provided under FECA are exclusive of all other remedies against the United States for job-related injury or death. <u>See</u> 5 U.S.C. § 8116(c); <u>Figueroa</u>, 7 F.3d at 1407. "If a plaintiff has a colorable claim under FECA, the federal courts should dismiss any action arising under the same facts for lack of subject matter jurisdiction." <u>Moe v. United States</u>, 326 F.3d 1065, 1068 (9th Cir. 2003).

It is clear that FECA is the "exclusive right to Government employees for compensation, in any form, from the United States" for job-related injury or death. <u>Johansen v. United States</u>, 343 U.S. 427, 439 (1952). In this case, however, Wilson-Sauls seeks recovery against the Federal defendants, her supervisors, in their individual capacity, for violations of her constitutional rights. It does not appear from the plain language of the statute that Congress intended the FECA to bar a <u>Bivens</u> action against a Federal agent in their individual capacity.[3] <u>See</u> <u>also</u> 5 U.S.C. § 8101

_____

[3]    Indeed, Wilson-Sauls contends that section 8116(c) does not apply to her claims against the Federal defendants because they are neither the "United States" nor an "instrumentality thereof." The court notes that several appeals courts have considered the issue directly and have held that FECA bars a

(refers to requirement that an "instrumentality" be wholly owned by the United States).

Moreover, the statutory scheme for FECA provides for an adjustment of benefits following recovery against third parties who may be liable to the employee for her injuries. Section 8132 provides, in part, that:

> If an injury or death for which compensation is payable under this subchapter is caused under circumstances creating a legal liability in a person other than the United States to pay damages, and a beneficiary entitled to compensation from the United States for that injury or death receives money or other property in satisfaction of that liability as the result of suit or settlement by him or in his behalf, the beneficiary, after deducting therefrom the costs of suit and a reasonable attorney's fee, shall refund to the United States the amount of compensation paid by the United States and credit any surplus on future payments of compensation payable to him for the same injury. . . .

5 U.S.C. § 8132. Additionally, a <u>Bivens</u> action provides for both a jury trial and punitive damages, neither of which are available under FECA. <u>See</u>, <u>e.g.</u>, <u>Carlson v. Green</u>, 446 U.S. 14, 21-23

---

federal employee's suit against the United States or its instrumentalities but does not bar a federal employee's suit against individual co-employees. <u>See</u>, <u>e.g.</u>, <u>Allman v. Hanley</u>, 302 F.2d 559, 563 (5th Cir. 1962) (FECA does not bar suits against fellow employees); <u>see also</u> <u>Heathcoat v. Potts</u>, 790 F.2d 1540, 1543-44 (11th Cir. 1986) (FECA "is silent on the matter of co-employee suits," following <u>Allman</u>); <u>Bates v. Harp</u>, 573 F.2d 930, 935 (6th Cir. 1978) ("[E]ven though we are not persuaded that co-employee suits are advisable as a matter of policy, in light of the overwhelming authority in support of such suits, absent an explicit statutory bar to the contrary, we feel constrained to follow the holding of <u>Allman</u>."); <u>Davis v. Harrod</u>, 407 F.2d 1280, 1282 n.2 (D.C.Cir. 1969) ("[U]nder the FECA it appears that appellant[] could sue [her co-employee], but not the District."). Notably, the Ninth Circuit has not directly ruled on this question.

(1980); accord Nurse v. Unites States, 226 F.3d 996, 1005 (9th Cir. 2000).

Finally, Wilson-Sauls is not attempting to extend Bivens in order to recover under a novel theory. Rather she relies on well-established precedent, grounded in a "state-created danger" theory, for her Bivens claim. Thus, Wilson-Sauls' important constitutional interests, pursued by her claim under Bivens, may not be adequately redressed under FECA, which restricts both her recoverable damages and the accountability of these Federal defendants. Nor does allowing her Bivens claim to proceed here authorize "a new kind of federal litigation." Wilkie, 127 S.Ct at 2598

Alternatively, the record reveals that while Wilson-Sauls did apply for and receive some benefits under FECA, it is undisputed that OWCP has recently "threatened to cut-off" Wilson-Sauls benefits. Memorandum in Opposition at 32. The court is unable to determine from this record for what reason or in what amount FECA payments were made to Wilson-Sauls. Further, a FECA claim presents two questions: (1) is the injury within the scope of FECA, and (2) is plaintiff entitled to compensation under the facts of her case. Figueroa, 7 F.3d at 1407. Even assuming that FECA would preempt Wilson-Sauls' Bivens claim, the Federal defendants have failed to establish either that FECA applies to the conduct challenged here or that Wilson-Sauls has been adequately compensated such that her Bivens claim must be preempted. Accordingly, the Federal

defendants' request for summary judgment against Wilson-Sauls' claim pursuant to <u>Bivens</u> should be denied.

## II.  Wilson-Sauls' Section 1983 Claim

Next, the Federal defendants seek an entry of judgment against Wilson-Sauls' claim pursuant to 42 U.S.C. § 1983 for a violation of her substantive due process rights under the Fifth and Fourteenth Amendments to be free from state-created danger. The Federal defendants contend that Wilson-Sauls' section 1983 claim fails because they were not acting under color of state law. According to the Federal defendants, the Attorney General has certified that they were federal employees who were acting within the scope of their employment at the time of the incident. In addition, the Federal defendants insist that there is no evidence that they acted under of color of state law during their work at the Depot, a federal army installation.

To establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).

It is undisputed that federal employees, like private individuals, can act under color of state law if they conspire or act in concert with state officials to deprive a person of her civil rights. <u>Billings v. United States</u>, 57 F.3d 797, 801 (9th Cir.

1995); <u>see also</u> <u>Lopez v. Dep't of Health Services</u>, 939 F.2d 881, 883 (9th Cir. 1991); <u>Collins v. Womancare</u>, 878 F.2d 1145, 1154 (9th Cir. 1989).  Action under color of state law has been interpreted to mean "misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." <u>Billings</u>, 57 F.3d at 801 (quotations and citation omitted) (9th Cir. 1995).

Federal officials, however, do not become "state actors" unless "[t]he State . . . has so far insinuated itself into a position of interdependence with . . . [the federal officials] that it must be recognized as a joint participant in the challenged activity. . . ." <u>Kletschka v. Driver</u>, 411 F.2d 436, 449 (2d Cir. 1969)(quotations and citation omitted).  To transform a federal official into a state actor, a plaintiff must show that federal and state officials engaged in a conspiracy or "symbiotic" venture to violate a person's rights under the Constitution or federal law. <u>Cabrera v. Martin</u>, 973 F.2d 735, 742-743 (9th 1992) ("To transform a federal official into a state actor, the appellees must show that there is a "symbiotic relationship" between the [federal defendants] and the state such that the challenged action can "fairly be attributed to the state."); <u>Kali v. Bowen</u>, 854 F.2d 329, 331 (9th Cir. 1988) ("[T]he plaintiffs make no allegation that federal and state officials conspired so that the actions taken by the federal officials could be deemed to have been 'under color of

state law'. . . ."); <u>Gibson v. United States</u>, 781 F.2d 1334, 1343
(9th Cir. 1986)("Federal officers acting under federal authority are
immune from suit unless the state or its agents significantly
participated in the challenged activity."); <u>Johnson v. Orr</u>, 780
F.2d 386, 390 (3rd Cir. 1986); <u>Knights of the Ku Klux Klan v. East</u>
<u>Baton Rouge Parish School Bd.</u>, 735 F.2d 895, 900 (5th Cir. 1984)
("Ordinarily, when federal officials conspire or act jointly with
state officials to deny constitutional rights, 'the state officials
provide the requisite state action to make the entire conspiracy
actionable under section 1983.'"); <u>Askew v. Bloemker</u>, 548 F.2d 673,
678 (7th Cir. 1976) ("[I]f plaintiffs are to rely on the concert-of-
action theory enunciated in <u>Kletschka v. Driver</u>, [411 F.2d 436],
the [plaintiffs] must at least have alleged a conspiracy between
the named defendants and these state officials as a basis for their
§ 1983 claim.").

As stated above, Wilson-Sauls alleges in her FAC that the
Federal defendants acted under color of state law to violate her
substantive due process rights under the Fifth and Fourteenth
Amendment to be free from state-created danger. She further
alleges with respect to "color of state law" that the federal
government "operates the Umatilla Army Depot within the State of
Oregon and under the auspices of the U.S. Army Chemical Materials
Agency in partnership or as a joint enterprise with the State of
Oregon." FAC at 2. Under the heading "FEDERAL/STATE PARTNERSHIP

FACTS" Wilson-Sauls provides the following evidence of a joint venture:

- Oregon state officials had access to the area where chemical weapons are stored because the federal government was required "to follow state requirements for DEQ . . . ."

- The DEQ had "oversight" over certain Depot functions and access to the Depot via a designated "work space." The State of Oregon issued a permit which was mandatory for the Depot to operate.

- DEQ shut down the Depot operations completely in 2005 due to safety concerns relating to rocket burning.

- In September 2006, state official Richard Duval was the administrator of the chemical demilitarization program at the Depot.

Plaintiff's Memorandum in Opposition at 21.

The court finds that Wilson-Sauls' allegations of "color of state law" are inadequate as a matter of law. The allegations of Wilson-Sauls' FAC along with the evidence set forth above fail to satisfy the requisite showing that the Federal defendants conspired or acted in concert with Oregon officials to deprive Wilson-Sauls of her civil rights. Nowhere either in the FAC or in the pleadings in opposition to summary judgment does Wilson-Sauls allege that the State of Oregon cloaked the Federal defendants, all federal employees, in any degree of state authority. Nor do the facts presented on summary judgment support such a conclusion. To the contrary, it is undisputed that the Federal defendants were employed by the federal government and that the Depot is a United States Army installation -- a federal army base patrolled by

29 - FINDINGS AND RECOMMENDATION                                    [LB]

federal officers and operated with the support of the United States Army Chemical Materials Agency and not a state, county, or municipality.  Although environmental actions at the Depot are regulated by the State of Oregon, there is no evidence that this regulatory function by the State intersected with the daily operations of the Depot security program such that the Federal defendants were acting on behalf of or at the direction of the State.

Similarly, Wilson-Sauls presents no evidence of a conspiracy between state officials and the Federal defendants to deprive  her civil rights.  Nowhere in either the FAC or any of the pleadings does Wilson-Sauls offer evidence to demonstrate that state officials and the Federal defendants reached an understanding to deny Wilson-Sauls her Constitutional rights.  Instead, the facts in the record, including the FAC, establish that Federal defendant's actions were allegedly taken under color of *federal* law.  Indeed, Wilson-Sauls' challenge under <u>Bivens</u> to the Federal defendants' conduct in violation of her Constitutional right turns on whether they were acting as a Federal agents of the Depot.  In her brief, Wilson-Sauls states "Because plaintiff's *Bivens* claim and her 1983 claim are essentially identical plaintiff will treat the two claims as one. . . ."  Plaintiff's Memorandum in Opposition at 35. Wilson-Sauls also cites a case for the proposition that "*Bivens*' actions are identical to those brought under 1983 except for the

30 - FINDINGS AND RECOMMENDATION                          [LB]

substitution of a federal actor for a state actor." <u>Id</u>. (citing <u>Van Strum</u>, 940 F.2d at 409. Finally, at oral argument Wilson-Sauls indicated that her claim under <u>Bivens</u> would provide the recovery she seeks.  The court agrees that a section 1983 action would provide duplicate remedies available to Wilson-Sauls pursuant to her <u>Bivens</u> claim.  Wilson-Sauls <u>Bivens</u> claim, which has survived summary judgment, provides an adequate remedy for the alleged conduct.  The court finds that Wilson-Sauls' section 1983 against the Federal defendants should fail as a matter of law and summary judgment is appropriate.

## III. Wilson-Sauls' Tort Claims

Next, the Federal defendants contend that Wilson-Sauls' Oregon common-law tort claims are barred by the Federal Torts Claim Act (FTCA), 28 U.S.C. §§ 1346(b)(1), 2671-2680.  The FTCA is a waiver of the federal government's sovereign immunity and allows the United States to be sued for certain torts, including claims for personal injury or death caused by the negligent or wrongful act of an employee of the United States who was acting within the scope of his employment.  <u>See</u> 28 U.S.C. § 1346(b)(1).[4]  The Federal

---

[4]    28 U.S.C. § 1346(b)(1) provides:

> Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of

Employees Liability Reform and Tort Compensation Act of 1988 (FELRTCA), which amended the FTCA, provides that "[t]he remedy against the United States" under the FTCA "for . . . personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages."  28 U.S.C. § 2679(b)(1).

FELRTCA provides that the Attorney General or his designee may certify that a defendant employee was acting within the scope of his employment at the time of the challenged incident and the United States is substituted as  the exclusive defendant and the action proceeds in United States district court.  Id. at § 2679(d)(1).  Thereafter, the suit proceeds as if the United States had been sued under the FTCA in the first instance.  Id. at § 2679(d)(4).  The Attorney General has the right to decide the scope of employment issue in the first instance, and his or her certification is "conclusive unless challenged." Green v. Hall, 8 F.3d 695, 698 (9th Cir. 1994).  A plaintiff may contest the Attorney General's scope of employment certification for the purposes of

---

> property, or personal injury or death caused by the
> negligent or wrongful act or omission of any employee
> of the Government while acting within the scope of his
> office or employment, under circumstances where the
> United States, if a private person, would be liable to
> the claimant in accordance with the law of the place
> where the act or omission occurred.

substitution.  <u>Gutierrez De Martinez v. Lamagno</u>, 515 U.S. 417, 420 (1995).

Turning to Wilson-Sauls' common-law tort claims, the FTCA imposes liability "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 2672.  Each of these common-law tort claims may be asserted under Oregon law and, with the exception of assault and battery[5], may be cognizable against the United States pursuant to the FTCA.

The United States Attorney for the Department of Justice in the District of Oregon has certified that each of the Federal defendants was acting within the scope of employment as an employee of the United States at the time of the incident out of which this suit arose.  In response, Wilson-Sauls challenges the Attorney General's certification and charges that "at times the defendants were acting within the scope of their duties (including the duty to supervise Mr. Holloman and to make sure he is capable of doing the work of a security guard) *and at times they were not*." Plaintiff's

---

[5]     Because the FTCA--the sole basis for a state common-law tort suit against a federal employee acting within the scope of his employment--does not waive tort immunity to claims "arising out of assault [or] battery," 28 U.S.C. § 2680(h), FELRTCA mandates that government employees have absolute immunity for acts committed within the scope of their employment for common-law intentional torts.  <u>See</u> <u>United States v. Smith</u>, 499 U.S. 160, 164-165 (1991).

33 - FINDINGS AND RECOMMENDATION                              [LB]

Memorandum in Opposition at 35-36. The court determines that
Wilson-Sauls adequately raised a challenge to the certification.

The Attorney General's certification that a government
employee was acting within the scope of his employment is subject
to *de novo* review by the court. See, *e.g.*, Aurthur v. United
States, 45 F.3d 292, 295 (9th Cir. 1995). Because § 2679(d) makes
the Attorney General's certification conclusive unless challenged,
"the party seeking review bears the burden of presenting evidence
and disproving the Attorney General's decision to grant or deny
scope of employment certification by a preponderance of the
evidence." Green, 8 F.3d at 698.

The court must review a FTCA scope of employment determination
according to the principles of respondeat superior of the state in
which the alleged tort occurred. McLachlan v. Bell, 261 F.3d 908,
911 (9th Cir. 2001). Under Oregon law, whether an employee has
acted within the scope of employment at any given time generally is
a question for the trier of fact, except in cases where only one
reasonable conclusion may be drawn from the facts pled. Stanfield
v. Laccoarce, 284 Or. 651, 655, 588 P.2d 1271 (1978). The proper
inquiries are: "(1) whether the act occurred substantially within
the time and space limits authorized by the employment; (2) whether
the employee was motivated, at least partially, by a purpose to
serve the employer; and (3) whether the act is of a kind which the

employee was hired to perform." <u>Chesterman v. Barmon</u>, 305 Or. 439, 442-443, 753 P.2d 404 (1988).

Viewing the facts in the light most favorable to Wilson-Sauls, material questions of fact are presented regarding whether the Federal defendants were acting within the scope of their employment at the time of the incidents from which the state tort claims arose. While there appears to be no dispute that the Federal defendants were acting substantially within the time and place authorized by the United States, Wilson-Sauls challenges the second and third elements to determine scope of employment. There is evidence in the record that the Federal defendants were charged with ensuring that Holloman was capable and qualified to perform the duties of security guard; that they were aware that Holloman may have been neither capable nor qualified to perform security detail with Wilson-Sauls on the day of the incident; and, they either disregarded their duties and/or failed to enforce regulations on February 11, 2005, when they dispatched Wilson-Sauls and Holloman, working as a security guard, to patrol a remote area of the Depot. These disputed questions must be resolved by an evidentiary hearing before a determination can be made whether the certification was proper, i.e., that the Federal defendants were in fact acting within the scope of their employment as defined by Oregon law. If the certification was proper, the FTCA is the exclusive remedy for Wilson-Sauls' state law tort claims for

negligence, breach of fiduciary duty and intentional infliction of emotional distress (IIED) and her claim for assault and battery should be dismissed. The Federal defendants' request to be dismissed from Wilson-Sauls' Oregon common-law tort claims and substitute the United States as party defendant pursuant to the FTCA should be denied pending an evidentiary hearing[6] on the question of scope of employment.

Finally, the Federal defendants argue that, in any event, each of Wilson-Sauls' tort claims fail as a matter of law because she can prove no set of facts in support and those claims must be dismissed for failure to state a claim.

## A.    Negligence

To state a negligence claim under Oregon law, plaintiff must allege that: (1) defendants' conduct caused a foreseeable risk of harm; (2) the risk was to an interest of a kind that the law protects against negligent invasion; (3) defendants' conduct was unreasonable in light of the risk; (4) the conduct was the cause of plaintiff's harm; and (5) plaintiff was within the class of persons and the injury was within the general type of potential incidents

---

[6]    Because the Attorney General's certification provides federal employees with absolute immunity from suit for common-law torts committed within the scope of their employment, the immunity question should be decided early in the proceedings, including on a motion for summary judgment. Authur, 45 F.3d at 295. "However, where disputed issues of fact exist relevant to immunity, summary judgment will not be appropriate until the district court has held an evidentiary hearing and resolved the disputes by formal findings." Id.

and injuries that made defendants' conduct negligent.  See Graham
v. Multnomah County, 158 Or. App. 106, 109-110, 972 P.2d 1215
(1999)(citations omitted).  Without deciding whether a "special
relationship" can be maintained here, Wilson-Sauls has presented
some evidence from which a jury could determine that, with respect
to Holloman and Wilson-Sauls, the Federal defendants  created a
foreseeable risk of harm and that the Federal defendants' conduct
was unreasonable in light of the risk created.  The Federal
defendants' motion to dismiss Wilson-Sauls' negligence claim for
failure to state a claim should be denied.

    B.   Assault and Battery

    In Oregon, assault is defined as "an intentional attempt to do
violence to the person of another coupled with present ability to
carry the intention into effect."  Cook v. Kinzua Pine Mills Co.
et al., 207 Or. 34, 48, 293 P.2d 717 (1956).  Battery is "a
voluntary act that is intended to cause the resulting harmful or
offensive contact."  Walthers v. Gossett, 148 Or. 548, 941 P.2d
575, 578 (1997).  It is for a jury to decide whether the Federal
defendants "abdicat[ed] their responsibility to control []Holloman
and to prevent him from accessing the Depot or from creating a
safety risk to his co-workers" and "affirmatively placed [Wilson-
Sauls] in danger when they paired her with []Holloman."
Plaintiff's Memorandum in Opposition at 39 (relying on Olsen V.
Deschutes County, 204 Or. App. 7, 127 P.3d 655 (2006))(emphasis

37 - FINDINGS AND RECOMMENDATION                              [LB]

added).   The Federal defendants' motion to dismiss Wilson-Sauls'
assault and battery claim for failure to state a claim should be
denied.

**C.    Breach of Fiduciary Duty**

Under Oregon law, the tort of breach of a fiduciary duty requires
proof of a "special relationship" between the parties.   See
Vanderselt v. Pope, 155 Or. App. 334, 340, 963 P.2d 130 (1998).
Generally, the employment relationship, in and of itself, is not a
"special relationship."   Vanderselt, 155 Or. App. at 340.   An
employee must therefore point to some duty outside the employment
relationship that gives rise to a "heightened duty of care" owed by
the employer to the employee.   Conway v. Pacific University 324 Or.
231, 244, 924 P.2d 818 (1996).

     Here, Wilson-Sauls has presented some evidence that the
Federal defendants were responsible to ensure that Holloman was
capable and qualified to perform his work duties before assigning
him to the security detail and that obligation extended to the
protection of co-workers.   See Bennett v. Farmers Ins. Co. of
Oregon, 332 Or. 138, 161-162, 26 P.3d 785 (2001)("The law implies
a tort duty only when that relationship is of the type that, by its
nature, allows one party to exercise judgment on the other party's
behalf.").   The Federal defendants' motion to dismiss Wilson-Sauls'
breach of fiduciary claim for failure to state a claim should be
denied.

### D. IIED

To succeed on a claim for IIED, plaintiff must show that: (1) defendant intended to inflict severe emotional distress on the plaintiff; (2) defendant's acts did in fact cause the plaintiff to suffer severe emotional distress; and (3) defendant's acts consisted of "some extraordinary transgression of the bounds of socially tolerable conduct." Lewis v. Oregon Beauty Supply Co., 302 Or. 616, 733 P.2d 430, 436 (1987). Based on the evidence presented by Wilson-Sauls here, both the intent requirement and whether the Federal defendants' conduct transgressed the bounds is for a jury. The Federal defendants' motion to dismiss Wilson-Sauls' breach of fiduciary claim for failure to state a claim should be denied.

### CONCLUSION

Based on the foregoing, the Federal defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment (doc. #70) should be GRANTED, in part, and DENIED, in part, as follows: judgment should be entered against Wilson-Sauls' claim pursuant to 42 U.S.C. § 1983, and that claim should be DISMISSED; further, assuming this Findings and Recommendation (F&R) is adopted without

modification to the FTCA analysis, an evidentiary hearing will be scheduled by the court once the a final order is entered.

DATED this 7th day of February, 2008.


     /s/Donald C. Ashmanskas
        Donald C. Ashmanskas
     United States Magistrate Judge

**SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due February 22, 2008.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.